Filed 9/2/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHRISTOPHER MINICK,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>CITY OF PETALUMA,<br><br>　　　Defendant and Appellant. | A143187<br><br>(Sonoma County<br>Super. Ct. No. SCV 251915) |

　　　After the trial court granted summary judgment for the City of Petaluma (the City) in this personal injury case, plaintiff Christopher Minick (Minick) moved for discretionary relief from the judgment under Code of Civil Procedure section 473, subdivision (b),[1] on grounds of "mistake, inadvertence, surprise or excusable neglect." His attorney, Joshua Watson, submitted a declaration in support of the motion explaining that, at the time he prepared Minick's summary judgment opposition papers, he was suffering from a serious illness for which he was under heavy medication. Although he was unaware of it at the time, Watson told the court, cognitive impairment caused by a combination of his illness and his medicated state led him to overlook readily available evidence. The court granted the requested relief, finding excusable neglect, and the City now appeals. In deference to the trial court's broad discretion on this type of motion, we shall affirm.

---

　　　[1] All further references to statutory provisions are to the Code of Civil Procedure unless otherwise specifically indicated.

# I. BACKGROUND

## A. Minick's Lawsuit and the Grant of Summary Judgment Against Him

While riding in the Holstein 100, a non-competitive charity bicycling event held as a fundraiser for West Marin Senior Services, Minick fell from his bicycle while descending a hill on Western Avenue in the City. Christopher Erwin, a friend riding behind Minick, saw him lose control of his bicycle after hitting a large pothole, pitching him head-first onto the pavement. Following the accident, Minick exhausted his administrative remedies with the City, and then brought suit against it alleging a single cause of action for maintaining a dangerous condition of public property under Government Code section 835. In his lawsuit, Minick was represented by the Dolan Law Firm. Watson was the associate at that firm with sole day-to-day responsibility for the case.

In August of 2013, the City filed a summary judgment motion arguing that Minick—who testified in deposition that he has no recollection of the accident, and only remembers waking up in the hospital afterward—had no proof of any dangerous condition on public property. Watson prepared and filed papers opposing the motion, attaching some grainy, low-resolution black-and-white photographs of the site where the accident was alleged to have taken place, including a photo showing Erwin standing in an unidentified street pointing to somewhere on the pavement; a copy of a police Collision Report containing a statement from Erwin that he had seen a pothole in the street where Minick fell; and an expert declaration from an engineer, Dale Dunlap, who offered the opinion that a defect in the street at the scene of the crash caused him to fall.

The City's motion was set for hearing on January 10, 2014. The day before the hearing the court issued a tentative ruling denying the motion. When the parties appeared for argument the next day, Watson appeared, but showed signs of physical distress during argument and was taken to a hospital by ambulance. The court continued the hearing to March 12, 2014. The day before the continued hearing, the court issued another tentative ruling, again denying the City's summary judgment motion, but after hearing argument

2

and taking the matter under submission for several weeks, eventually reversed its tentative ruling and granted the motion.

Referring at one point to Watson's arguments as "ludicrous," the court sustained the City's hearsay and lack of foundation objections to the accident site photographs; pointed out that because of the poor quality of the images, little could be gleaned from them in any event, other than that there may have been some minor cracking in the street; and went on to sustain lack of foundation and speculation objections to Dunlap's opinion, since he had no direct knowledge of the site and relied only on the sketchy information Minick presented in the form of the photographs and the police report. Watson seemed to recognize that he failed to provide sufficient foundational evidence for various documents attached as exhibits to his opposition papers, stating in an accompanying declaration that he intended to take the depositions of a custodian of records, but adding—as if an attempt to obtain evidence could substitute for its absence—that the depositions had been continued at the City's request, without any explanation of whether he moved to compel, and if not, why not.

In light of the many deficiencies in Minick's opposition showing, the court agreed with the City that Minick had failed to present admissible evidence of any dangerous condition of public property, and issued an order granting summary judgment on May 13, 2014.

### B. Minick's Motion for Discretionary Relief Under Section 473, Subdivision (b)

On June 19, 2014, Minick filed a motion for discretionary relief from the judgment under section 473, subdivision (b), supported by a declaration from Watson. Watson explained that he had been suffering from serious pulmonary and sleep disorders throughout 2013, and that his symptoms gradually worsened as the year progressed. He sought medical treatment and was put on a regimen of 12 different medications. In the course of treatment, he went to the emergency room four times, twice by ambulance; he consulted with five medical specialists in dozens of appointments; and he underwent radiological studies, lab studies, ultrasound studies, and sleep studies. Although

3

Watson's underlying pulmonary condition gradually improved, he claimed to have suffered side effects from the medications, including painful spasms, episodes of disorientation, and periods of uncharacteristically strong responses to stressors.

From August through December 2013—a time period coinciding with his efforts to prepare summary judgment opposition papers for Minick—Watson reported that the combination of symptoms from illness and the side-effects from his medications were at their peak. Although at the time he felt he was adequately "soldiering on" despite the medical crisis he was in, Watson declared that, looking back on that period of time, he could see that his judgment was clouded, his thought processes were not as clear and dispassionately critical as was normal for him, and he suffered from gaps in his memory. Watson explained that he was an experienced trial lawyer, and to that point had a record of considerable success in law practice, but that in 2013, as a result of his medical condition, his ability to perform as a lawyer fell, and he made decisions in this case "that were not in keeping with [his] ordinary practice of law."

"These shortcomings were not born of any lack of effort, complacency, disregard, or lack of caring about my client or the Court," Watson declared. Rather, he told the court, they were a result of his "serious illness and the side effects of [the] prescribed medications." Moreover, because his judgment was clouded and his thought processes were impaired, and because he had no previous experience with such symptoms, Watson did not realize he was cognitively impaired and thus made no effort to tell colleagues or clients about his condition. Because of his impairment, Watson stated, he did not realize he needed admissible evidence to support the opposition. Instead, he said, he inexplicably thought that, because an expert can rely on hearsay, no foundation was needed for the facts on which the expert's opinion was based.

In further support of Minick's section 473 motion, Watson submitted declarations that provided the necessary foundation for Dunlap's opinion, and, independently of that opinion, enough evidence to show the City maintained a dangerous condition on a public street that caused Minick's accident. A declaration from Erwin established that he had gone with Minick on numerous rides, and that Minick was an experienced and safe rider.

4

Erwin stated that he rode with Minick during the event on August 20, 2011. Toward the end of the ride, he said he was behind Minick. Immediately before and at the moment of the accident, Minick was riding at a safe speed and in a safe manner, Erwin said. According to Erwin, Minick did not suddenly brake or do anything to destabilize the bicycle, but his bicycle suddenly stopped, with the front wheel twisting sideways, catapulting him into the street. It was clear to Erwin that Minick's bicycle encountered something in the street that caused the front wheel to twist and throw him forward. Erwin could see that Minick suffered serious injuries, including to his head and shoulder, and had to be taken to the hospital by ambulance. After Minick was taken to the hospital, Erwin looked at the street where the accident occurred. He saw "many deviations in its surface, including cracks, holes, abrupt vertical rises, and bumps."

Erwin also confirmed that the photographs attached to his declaration accurately depicted the pavement at the accident site on the date of Minick's injury. The deviations in the street surface were not marked and a rider could not see their severity until coming upon them. They were dangerous to a road bicycle, like the one Minick was riding, because they could grab and twist the front wheel, popping the bicycle into the air and causing the rider to lose control. It appeared to Erwin that this uneven pavement was part of a trench that had been dug and patched. When he later returned to the site, as depicted in a photograph with him pointing at the street where Minick fell, the surface had been repaved after the accident. Thus, the photograph, which the court stated showed only a trivial defect, was not designed to show the dangerous condition, but only its location.

In addition to the Erwin declaration, Minick submitted a declaration from Scott Andrews, a resident of the area near Minick's accident. Andrews, misidentified as Scott Takami in the discovery responses Watson submitted in opposition to the City's summary judgment motion, said he took the photographs that were originally supplied to the court with Minick's summary judgment opposition. He explained the circumstances of his having taken the photographs, identified them as depictions of the location in the street where Minick's accident took place, and confirmed that they "accurately depict the

5

condition of the pavement on Western Avenue, to the west of the Intersection of Hill Street and Western Avenue" in the City "where Mr. Minick was found injured."

Relying on the new foundational information from Erwin and Andrews, a supplemental declaration from Dunlap offered additional support for his expert opinion. Based on a review of the Erwin and Andrews declarations and various additional better, quality photographs authenticated in those declarations, Dunlap identified "a substantial series of defects at the same point identified by Mr. Erwin in his declaration." He concluded that Minick struck a depression in the street where two lines of trenching visible in the photographs intersected. He found the defect identified in the Erwin declaration and photographs consistent with the measurements in the traffic collision report. Further, based on these materials, he opined that the accident site was "in a state of significant disrepair," which posed hazards from "sudden bumps, dips, and ledges," including potholes, that could cause a bicycle rider to lose control.

Dunlap concluded that the condition of the street constituted a dangerous condition. "In my opinion," Dunlap declared, "Mr. Minick's bicycle tire most likely lost friction as it passed over the bumpy road approaching the intersection of the light trenching and main trench line discussed above, then struck the lip of the lighter trench line, such that the bicycle stopped and Mr. Minick flew off his bicycle and was injured. I may defer to an accident reconstructionist on this point, but within the scope of my expertise, this mechanism of the incident is consistent with Mr. Erwin's declaration, and is the type of danger that . . . [applicable road building and maintenance] standards . . . seek to guard against."

The court also thought the opposition was so poorly written that it wondered if something was seriously amiss. The papers were "strikingly not well written and, frankly, left the Court wondering—to be really honest, . . . what was going on, because it didn't seem to me it was of the quality that any firm, whether it be plaintiff or defense, would provide in a—you know, in response to a well written summary judgment motion." "The issue that concerns the Court is this, and I'll be quite frank about it, is that when I sat down and spent the time that I spent to re-review the evidence and re-review

6

the objections and to go through it piece by piece, because it was such a bundle of misstatements and misdirection from the side of the plaintiff in this case, and I sat down and tried to put it all together and do the best that I could with what I had, and when I made that ruling, I did make that [summary judgment] ruling with some degree of concern about it, because it was astounding to me . . . how it was that it was put together and provided to the Court." The court also stated that if it had had the evidence that Minick submitted with the motion for relief from judgment—namely, the Erwin, Andrews, and supplemental Dunlap declarations—it would have denied the summary judgment motion.

Responding directly to the City's contention that Minick still had not submitted evidence of a dangerous condition, the court stated: "If the Court were to consider today the new matter, . . . there would at least be sufficient evidence for purposes of discussion about what the dangerous condition was. [¶] I mean, you do have someone . . . who was riding his bicycle at the same time as plaintiff and who stopped when plaintiff tumbled and was injured and then saw the area where he fell and identified in his new declaration—again, not his original one, but the new declaration—where that occurred. And there are photographs, color photographs of greater clarity showing conditions in the roadway that at least arguably could constitute a dangerous condition of public property under 835 of the Government Code. [¶] I think there's more for purposes of discussion now than there was, substantially more now for the purposes of discussion than was presented previously to the Court, now, again, even if evidentiary objections had not been sustained at the initial filing [of] the motions."

At the conclusion of the hearing, the court announced its intention to grant discretionary relief under section 473, subdivision (b), explaining as follows: "The Court finds that Mr. Watson . . . was suffering from a medical state that he was generally unaware of and there was some neglect that was involved in that. To the extent that he may or may not have been able to address his issues during the pendency of this matter is perhaps not expressly determined, but the Court does understand that he had a medical condition, that the medication condition affected his ability to exercise proper judgment,

that he provided pleadings, filed pleadings and acted in such a manner that is contrary to his own practice, that the inadvertence and neglect were the result of a medical condition that he later became aware of.  So that is the basis for the Court's ruling . . . ."  An order granting section 473 relief from judgment issued August 7, 2014, and the City timely sought review of that order.[2]

## II.     DISCUSSION

### A.     Standard of Review

Section 473 is a remedial statute to be "applied liberally" in favor of relief if the opposing party will not suffer prejudice.  (*Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233 (*Elston*); see also *Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 256 (*Zamora*) [" 'the provisions of section 473 of the Code of Civil Procedure are to be liberally construed' "].)  "[B]ecause the law strongly favors trial and disposition on the merits, any doubts in applying section 473 must be resolved in favor of  the party seeking relief from default." (*Elston*, *supra*, 38 Cal.3d at p.  233; *Rappleyea v.  Campbell* (1994) 8 Cal.4th 975, 980, quoting this language in *Elston* with approval.)  "Unless inexcusable neglect is clear, the policy favoring trial on the merits prevails." (*Elston*, *supra*, 38 Cal.3d at p. 235.)

A trial court's ruling granting discretionary relief under section 473, subdivision (b) " 'shall not be disturbed on appeal absent a clear showing of abuse.' " (*Zamora*, *supra*, 28 Cal.4th at p.  257, quoting *State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 (*State Farm*).)  The scope of the trial court's discretion under section 473 is broad (*Elston*, *supra,* 38 Cal.3d at p. 233) and its factual findings in the exercise of that discretion are entitled to deference (*H.D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1368; see also *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 ["when two or more inferences can reasonably be deduced from the facts, a reviewing court lacks power  to substitute its deductions for those of the trial court"]).

---

[2] See section 904.1, subdivision (a)(2) (an order following a judgment that is appealable under section 904.1, subdivision (a)(1), is itself appealable).

On review, appellate courts have repeatedly noted that an abuse of discretion may be found only if a grant of relief "exceed[s] the bounds of reason." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478 (*Shamblin*); accord, *Sanchez v. City of Los Angeles* (2003) 109 Cal.App.4th 1262, 1271.) Given the usual presumption of correctness accorded trial court rulings on appeal, the party attacking a trial court's grant of relief—here the City— bears the burden of demonstrating error. (*State Farm*, *supra*, 90 Cal.App.4th at p. 610, citing *Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 718.) By the same token, the affidavits presented by the party for whom relief was granted—here Minick—establish "not only the facts stated therein but also all facts which reasonably may be inferred therefrom . . . ." ' " (*Zamora*, *supra*, 28 Cal.4th at p. 258.) Moreover, the trial court may rely on its own review of the record in determining the existence of excusable neglect. (*In re Marriage of Kerry* (1984) 158 Cal.App.3d 456, 466.)

Any exercise of discretion must rest on correct legal premises, of course, and in that respect our review is de novo. "A trial court abuses its discretion when it applies the wrong legal standards applicable to the issue at hand." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 85.) " 'Discretion is compatible only with decisions "controlled by sound principles of law, . . . free from partiality, not swayed by sympathy or warped by prejudice. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.) " '[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' " (*Ibid.*)

### B. Applicable Principles Under the Discretionary Relief Portion of Section 473, Subdivision (b)

Section 473, subdivision (b), provides, in pertinent part: "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect. . . . No affidavit or declaration of merits shall be required of the moving party. Notwithstanding any other requirements of this section, the court shall, whenever an application for relief is made no more than

9

six months after entry of judgment, is in proper form, and is accompanied by an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, vacate any (1) resulting default entered by the clerk against his or her client, and which will result in entry of a default judgment, or (2) resulting default judgment or dismissal entered against his or her client, unless the court finds that the default or dismissal was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect."

The statute includes a discretionary provision, which applies permissively, and a mandatory provision, which applies as of right. Although this bifurcation is not demarcated in any internal subtitling, it is plainly evident in the textual structure of the statute. Section 473, subdivision (b), begins with broad language authorizing relief from a "judgment, dismissal, order, or other proceeding" for "mistake, inadvertence, surprise, or excusable neglect," and then, in narrower proviso language applicable to a "default," "default judgment" or "dismissal," requires relief upon the filing of an "attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect." The mandatory relief provision fits into the broader language of the statute as a special case tucked within it. "The provision of section 473 which mandates relief from a judgment of dismissal or default when the motion is based on an attorney's affidavit of fault does not mandate relief from other judgments. In all other cases, relief is discretionary. [Citation.] . . . [¶] Relief can only be granted under the mandatory provision in section 473, subdivision (b), if relief could have been granted under the discretionary provision." (*Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 681 (*Garcia*)).[3]

This case arises solely under the discretionary relief provision. To obtain discretionary relief for attorney error under section 473, subdivision (b), counsel's neglect must be excusable. (*Zamora*, *supra*, 28 Cal.4th at p. 258.) Because attorneys

---

[3] See *English v. IKON Business Solutions, Inc.* (2001) 94 Cal.App.4th 130, 138–142 (*English*) (parsing the statutory history and case law interpretation of the mandatory "attorney fault" provision in section 473, subdivision (b), which was added by amendment in 1988 as a narrow exception to the broader discretionary relief provision, which in turn has been part of the statute since its enactment in 1851).

as members of a learned profession are held to a standard of conduct befitting those with specialized training and skill, and because as a general matter clients are bound by the judgments and decisions of their chosen counsel, the excusability standard under section 473 is often difficult to meet where a client seeks relief for the errors or omissions of his or her attorney. That is because "[i]n determining whether [an] attorney's mistake or inadvertence was excusable, 'the court inquires whether "a reasonably prudent *person* under the same or similar circumstances" might have made the same error.' [Citation.] . . . [T]he discretionary relief provision of section 473 only permits relief from attorney error 'fairly imputable to the client, i.e., mistakes anyone could have made.' " (*Garcia*, *supra*, 58 Cal.App.4th at p. 682.) 'Conduct falling below the professional standard of care, such as failure to timely object or to properly advance an argument, is not therefore excusable. . . . .' (*Ibid.*)" (*Zamora, supra,* 28 Cal.4th at p. 258.)

Numerous cases have applied this principle in the context of failed attempts to defend against summary judgment—a phase of civil litigation that is among the most rigorous and exacting prior to trial—and in none of these cases was attorney error found to be excusable. (See *Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 17 ["Section 473 cannot be used to remedy attorney mistakes, such as the failure to provide sufficient evidence in opposition to a summary judgment motion. [Citation.] . . . Counsel's failure to understand the type of response required or to anticipate which arguments would be found persuasive does not warrant relief under section 473."]; *Ambrose v. Michelin North America, Inc.* (2005) 134 Cal.App.4th 1350, 1354–1355 [failure to include a request for a continuance pursuant to section 437c, subd. (h) in opposition to summary judgment does not constitute excusable neglect]; *Martin v. Johnson* (1979) 88 Cal.App.3d 595, 606–607 [no abuse of discretion in refusing to vacate summary judgment due to attorney's error in submitting declarations not within the personal knowledge of the declarant]; cf. *Generale Bank Nederland v. Eyes of the Beholder Ltd.* (1998) 61 Cal.App.4th 1384, 1399 [failure to lay proper foundation for admission of evidence at prove-up hearing on third party claim not excusable neglect

warranting mandatory relief from judgment based on attorney's affidavit of fault under section 473].)

*Garcia*, *supra*, 58 Cal.App.4th 674, decided by our colleagues in Division Two of this district, is an especially noteworthy summary judgment case where discretionary relief under section 473 for attorney error was denied, since the California Supreme Court relied on it and quoted from it in *Zamora*. (See *Zamora, supra,* 28 Cal.4th at pp. 257-258.) The summary judgment motion in *Garcia* turned on the scope and meaning of a settlement agreement. The trial court initially granted summary judgment for defendant Hejmadi based on the plain language of the agreement, but later granted a motion to vacate under section 473, subdivision (b). (*Garcia*, *supra*, at pp. 678–680.) In support of the section 473 motion, plaintiff Garcia submitted late supplemental declarations attesting to oral communications that allegedly raised triable issues concerning the parties' mutual intent when the agreement was signed. (*Ibid.*) Garcia's counsel admitted his failure to submit these declarations earlier was a mistake, but explained his tardiness on grounds of "inadvertence and time pressure" in his law practice. (*Id.* at p. 679.) That excuse failed on appeal.

Reversing the trial court's grant of section 473 relief, the panel in *Garcia* explained: "The record describes the tardy presentation of an alternative argument based upon facts and law at all times known to Garcia's counsel . . . . The 'inadvertence' asserted by Garcia's counsel is no more than late recognition of inadequate briefing and failure to cite more specifically to a paragraph in a declaration. . . . [¶] Garcia's presumption that consideration of the late-filed papers . . . would have produced a different result begs the question. The issue is not whether the original opposition was insufficient to prevail, but rather whether the reason advanced for its insufficiency was 'excusable' within the meaning of section 473. The 'reasonably prudent person standard' . . . gives an attorney the benefit of such relief only where the mistake is one which might ordinarily be made by a person with no special training or skill." (*Garcia*, *supra*, 58 Cal.App.4th at pp. 683–684.) Distraction due to the "press of business" was not such a mistake, the court held. "[T]he stress admittedly attending modern legal

12

practice" does not "afford[] an acceptable excuse for neglect within the meaning of the Code of Civil Procedure." (*Id.* at p. 684.)[4]

## C.     Cognitive Incapacity as a Ground for Relief

Relying heavily on *Garcia*, the City contends Watson was simply trying to secure a "do over" when he realized upon reflection that his summary judgment opposition papers might have been stronger. According to the City, this is a case of simple professional negligence. On one reading of the record, we might agree, but that is not the reading the trial court adopted. While the City frames the court's ruling as having been based on Watson's "tactical decisions and conduct as an attorney," that characterization of the issue here does not comport with the court's findings. The court specifically found the relevant neglect was Watson's failure to appreciate his own impairment, which was a mistake anyone could have made, not a failure of legal skill. Watson's cognitive impairment, to be sure, certainly *caused* his feeble lawyering—there was a specific finding on that point as well—but professional incompetence, per se, was not the neglect the court found to be excusable.

In resolving Minick's motion, the court was faced with two competing versions of the facts. Minick argued, on the one hand, that the best explanation of the situation was cognitive incapacity, not professional dereliction. The City argued, on the other hand, that Watson's opposition papers, despite their defects, could be considered at least minimally competent. Having seen Watson in physical distress at one point in open court and having reviewed his work product, the court seems to have accepted Minick's point

---

[4] After explaining that ordinary professional neglect cannot be recognized as excusable, the court acknowledged an exception for circumstances "where the attorney's neglect, although inexcusable, was so extreme as to constitute misconduct effectively ending the attorney-client relationship. 'Abandonment' may afford a basis for relief, at least where the client is relatively free of fault, but performance which is merely inadequate will not. . . . For the exception to apply, the attorney's misconduct must be sufficiently gross to effectively abrogate the attorney-client relationship, thereby leaving the client essentially unrepresented at a critical juncture in the litigation." (*Garcia*, *supra*, 58 Cal.App.4th at pp. 682–683; see *Carroll v. Abbott Laboratories, Inc.* (1982) 32 Cal.3d 892, 898; *Daley v. Butte County* (1964) 227 Cal.App.2d 380, 391.) Minick has not argued the client abandonment exception, in the trial court or on appeal.

of view. Because Watson's opposition papers were such an unintelligible mess, the court explained at the hearing on Minick's section 473 motion that it had granted summary judgment despite harboring reservations that something was amiss. Watson's declaration apparently provided a credible explanation, and the court accepted it. Under these circumstances, we cannot say the court's exercise of discretion under section 473 "exceeded the bounds of reason." (*Shamblin*, *supra*, 44 Cal.3d at p. 478.)

If Watson's claim of cognitive incapacity is enough to warrant relief under section 473, subdivision (b), the City argues, where is the stopping point? Whenever an attorney omits key authority, overlooks readily available evidence, or fails to object, how are courts to decide whether the error resulted from "[not taking] a particular medication, or . . . a poor night's sleep the night before, or . . . a [distracting] personal matter . . . ? Which excuse would be sufficient and which would not? There would be no finality to motion practice in California . . . . [¶] Summary judgments would not result in judgments but mere suggestions to the losing party of how the evidence could be better presented, with each case to be re-opened upon an attorney's showing that he could have done better." We view this set of concerns as overdrawn. Suffice it to say we are confident that trial courts, in their application of section 473, can distinguish between flimsy claims of illness or distraction and genuine medical distress that is so severe it impedes the lawyer's ability to warn his client or seek assistance from colleagues.

### D. The Argument That Discretionary Relief Under Section 473, Subdivision (b), Is Limited to Defaults or Default-Equivalent Conduct

The City never seriously questions the truth of Watson's explanation that a combination of serious illness and heavy medication rendered him incapable of carrying out his duties as a lawyer. Instead, it contends Minick's declaration of his own incapacity is insufficient to warrant relief under section 473 as a matter of law. The main thrust of the City's argument is that absent an actual default—here, for example, failure to file any summary judgment opposition at all (see e.g. *Lynch v. Spilman* (1967) 67 Cal.2d 251, 258 [affirming order vacating summary judgment where attorneys failed to appear at

14

hearing or file opposition papers])—discretionary relief under section 473, subdivision (b), is unavailable. Attempted but ultimately unsuccessful advocacy can never constitute excusable neglect, the City argues, for if the rule were otherwise, requests for discretionary section 473 relief based on attorney error would require courts to undertake open-ended evaluation of deficient lawyering performance, miring them, inevitably, in questions of legal strategy and judgment.

For this argument, the City relies on *Garcia*. Because that case involved not "a default but rather a motion lost, on its merits, after opposition was filed," the *Garcia* court viewed section 473 as inapplicable. (*Garcia, supra,* 58 Cal.App.4th at p. 683.) The court arrived at this conclusion based on cases limiting the applicability of the mandatory portion of section 473, subdivision (b) to defaults and default-equivalent dismissals. (*Ibid*.; accord, *Bernasconi Commercial Real Estate v. St. Joseph's Regional Healthcare System* (1997) 57 Cal.App.4th 1078, 1082 (*Bernasconi*); see also *Peltier v. McCloud River R.R. Co.* (1995) 34 Cal.App.4th 1809, 1817.) Without that limitation, these cases reason, the mandatory dismissal portion of section 473 conflicts with the statutes authorizing discretionary dismissal for dilatory prosecution, since a party who suffers such a default can freely nullify the dismissal—by right— through the simple expedient of filing an attorney affidavit of fault. (*Bernasconi*, *supra*, 57 Cal.App.4th at pp. 1081– 1082 [applying the mandatory provision of § 473, subd. (b), literally, to any dismissal, "would effectively abrogate the discretionary dismissal statutes, since few if any dismissals under those statutes would ever be final"].)[5]

The *Garcia* court transplanted this rationale to the discretionary portion of section 473, subdivision (b), explaining that "[w]e find this reasoning equally serviceable here, where there was no complete failure to oppose, but rather an opposition which was, though apparently timely and procedurally adequate, inadequate in substance." (*Garcia,*

---

[5] These cases are in line with other appellate opinions adopting narrow constructions of the mandatory attorney fault provision of section 473, subdivision (b), to prevented it " 'from being used indiscriminately by plaintiffs' attorneys as a "perfect escape hatch" [citation] to undo dismissals of civil cases.' " (*English*, *supra*, 94 Cal.App.4th at p. 141, quoting *Huens v. Tatum* (1997) 52 Cal.App.4th 259, 263.)

*supra,* 58 Cal.App.4th at p. 683.)  Citing this language from *Garcia*, the City would have us limit the availability of discretionary relief for attorney error under section 473, subdivision (b), to defaults and default-equivalent conduct.  Nothing in *Zamora* or in the text of section 473 compels such a narrow interpretation of the statute.  We prefer the plain language reading of section 473, subdivision (b), applied recently by Division Two of the Second District Court of Appeal in *Martin Potts & Associates, Inc. v. Corsair, LLC* (2016) 244 Cal.App.4th 432 (*Corsair*), which rejected the idea that an identical construction must be placed on the mandatory and discretionary provisions of section 473.  In holding that it is unnecessary for an attorney to set forth reasons for his claimed "mistake, inadvertence, surprise, or neglect" in order to qualify for mandatory relief under section 473, the panel in *Corsair* explained that, because "the statutory language creating the mandatory and discretionary relief provisions of section 473, subdivision (b) is significantly different," these two parts of the statute need not be read in pari materia. (*Corsair*, *supra*, at p. 440.)[6]

By its terms, the discretionary relief portion of section 473, subdivision (b) is not limited to defaults and default-equivalent conduct, and we see no reason to require such a limitation by construction.  The statute provides, "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect."  The only limiting language comes later, in

---

[6] See also *English*, *supra*, 94 Cal.App.4th at page 137 ("By carefully differentiating between the scope of the discretionary provision of section 473(b) (which applies to 'a judgment, dismissal, order, or other proceeding') and the scope of the mandatory provision (which applies to a 'default' or a 'default judgment or dismissal'), the Legislature chose to limit the circumstances in which a court *must* grant relief based on an attorney's mistake, inadvertence, surprise, or neglect."), italics added; *id.* at page 149 (Despite the limited construction placed on the mandatory relief provision of the statute, "[i]n the appropriate circumstances . . . relief from a summary judgment may be available to either a plaintiff or a defendant under the discretionary provision of section 473(b). [Citation.]  This is so because discretionary relief under the statute is not limited to defaults, default judgments, and dismissals, but is available from any judgment.").

the narrower mandatory relief provision. Although we agree that the discretionary provision of section 473, subdivision (b), should not be applied so expansively that it provides a guaranteed "avenue for attorneys to escape the consequences of their professional shortcomings by the filing of a simple motion" (*Garcia*, *supra*, 58 Cal.App.4th at p. 685), where, as here, the court finds a wholesale disintegration of the attorney's professional capacity because of a medical crisis, the availability of relief for excusable neglect is within the court's sound discretion.

### E. *Transit Ads* and the Sufficiency of Minick's Showing of His Own Incapacity

In addition to *Garcia*, the City cites *Transit Ads, Inc. v. Tanner Motor Livery, Ltd.* (1969) 270 Cal.App.2d 275 (*Transit Ads*), a case in which an attorney's illness was deemed insufficient to warrant relief under section 473. In *Transit Ads*, the trial court entered a default judgment against the defendant. (*Id*. at p. 278.) The defendant's attorney then sought relief on the ground that he had been ill, asserting that medication he took as part of a weight loss program affected his general mental and physical condition such that he was absent from his office for long periods of time and was unable to conduct his law practice properly. Although the attorney engaged a colleague to prepare and file an answer, he did not keep his appointments with the assisting colleague and he did not communicate the urgent need to prepare and file an answer. (*Id*. at p. 286.)

The Court of Appeal agreed that "[i]llness of counsel which actually disables him from timely compliance with the statutory rules of procedure constitutes excusable neglect." (*Transit Ads*, *supra*, 270 Cal.App.2d at p. 280.) But the court went on to find the neglect at issue in that case was inexcusable because the attorney was aware of his medical condition yet failed to take the steps a reasonably prudent person would have taken. Despite being aware that his medical difficulties were hindering his practice, counsel made no effort to seek assistance from colleagues or to contact his client about the possibility of retaining someone else. (*Id*. at p. 287.) Thus, the court concluded "[t]here is no showing that disabling illness, and not inexcusable neglect, was the real cause for the default." (*Id*. at pp. 287–288.) *Transit Ads* is a default case that predates

17

the enactment of the mandatory provision of section 473, subdivision (b) (see fn. 3, *ante*), and thus we suspect it would have been decided differently today, but more importantly, here there was a specific finding that Watson's impaired condition caused the fatal deficiencies in Minick's summary judgment opposition. Unlike the dieting attorney in *Transit Ads*, moreover, Watson was found to have been unaware of his own impairment.

Even if an attorney's illness can supply legal grounds for a finding of excusable neglect in some circumstances, the City argues, Watson "cannot attest to whether his medical condition caused him to suffer clouded judgment or other mental deficits" because his claim of cognitive disability constitutes improper lay opinion. (See Evid. Code, § 800, subd. (a) [lay opinion testimony must be rationally based upon the perception of the witness].) With that we disagree. Watson had knowledge of his own physical and mental condition because he personally experienced the symptoms he reported. (See, e.g., *People v. Lewis* (2001) 26 Cal.4th 334, 356 [to testify, a lay witness must have personal knowledge, which is " 'a present recollection of an impression derived from the exercise of the witness' own senses' "].) Because that knowledge provided a foundation for his testimony (Evid. Code, §§ 403, subd. (a)(2), 702, subd. (a)), Watson could attest to his own medical condition as a fact known to himself. (See, e.g., *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 528 ["lay witnesses are generally competent to testify as to their own knowledge of their diseases, injuries, or physical condition"]; *Frederick v. Federal Life Ins. Co*. (1936) 13 Cal.App.2d 585, 590 [" 'a witness may testify whether he has had a particular disease as a matter of fact known to himself, and not as a matter of opinion' "].)

Cases decided under section 473 are in accord. Without requiring the declaration of a physician, a number of California decisions have upheld orders granting discretionary relief under section 473, subdivision (b), because of counsel's illness. (See, e.g., *Contreras v. Blue Cross of California* (1988) 199 Cal.App.3d 945, 951 [trial court did not abuse its discretion in finding that attorney's failure to file timely amended complaint was excusable where she had fractured her wrist and elbow]; *Robinson v. Varela* (1977) 67 Cal.App.3d 611, 616 [trial court did not abuse its discretion in

18

finding that attorney's failure to file a timely answer was excusable in part because attorney was suffering from an unspecified illness]; *Arnke v. Lazzari Fuel Co.* (1962) 202 Cal.App.2d 278, 281–282 [counsel's declaration that he failed to file a timely answer because he had an unspecified illness and had been engaged in negotiations to settle the dispute constituted sufficient evidence of excusable neglect].) The City cites no contrary authority under section 473, but instead relies on miscellaneous state and federal decisions taken from other contexts for the general proposition that, in the face of a defense expert's declaration that the plaintiff does not suffer from a particular disease, a plaintiff, to survive a summary judgment, must submit a declaration from his own medical expert. Procedurally, that is not the posture of this case.

### F. Minick's Diligence in Filing for Section 473 Relief and Prejudice to the City

In reply, the City advances two new arguments. It contends, first, that Minick failed to exercise diligence in bringing his section 473 motion "within a reasonable time" (see *Huh v. Wang* (2007) 158 Cal.App.4th 1406, 1420 ["[A] threshold requirement for relief is the moving party's diligence. . . . As the statute itself provides, application for relief 'shall be made *within a reasonable time,* in no case exceeding six months, after the judgment, dismissal, order, or proceeding was taken."], citation omitted, italics in original), and second, that the trial court failed to give proper weight to prejudice caused to the City. (See *Nilsson v. Los Angeles* (1967) 249 Cal.App.2d 976, 980 ["In weighing a motion for relief under section 473 of the Code of Civil Procedure the trial judge could properly consider as a factor favoring relief the absence of any prejudice to the opposing party as the result of its order."].) Ordinarily, we would deem arguments made for the first time in reply to have been forfeited, but since Minick addresses both issues in his responding brief, unprompted, we briefly address each one.

In granting relief from judgment, the trial court implicitly found that Minick filed his motion "within a reasonable time." We review that implied finding for abuse of discretion. (See *County of Los Angeles v. Sheldon P.* (2002) 102 Cal.App.4th 1337, 1347 [trial court's implied finding that the moving party was diligent is reviewed for

19

abuse of discretion].) What constitutes " 'a reasonable time in any case depends upon the circumstances of that particular case' " (*Martin v. Taylor* (1968) 267 Cal.App.2d 112, 114) and is a question of fact for the trial court (*Younessi v. Woolf* (2016) 244 Cal.App.4th 1137, 1145). Here, the court entered judgment on May 13, 2014, and notice of entry of judgment was served by mail on May 15. The date of entry of judgment was the point in time at which a need for section 473 relief arose (see *Huh v. Wang*, *supra*, 158 Cal.App.4th at p. 1421 [the "critical triggering event for seeking relief from the judgment was notice of its entry"], italics omitted), and Minick filed his motion a little over five weeks after that date, on June 19.

Numerous courts have found no abuse of discretion in granting relief where the section 473 motions at issue were filed seven to 10 weeks after entry of judgment. (See, e.g., *Freeman v. Goldberg* (1961) 55 Cal.2d 622, 625 [10-week delay]; *Hallett v. Slaughter* (1943) 22 Cal.2d 552, 554, 557 [seven-week delay]; *Outdoor Imports, Inc. v. Stanoff* (1970) 7 Cal.App.3d 518, 523–524 [nine-week delay].) A delay is unreasonable as a matter of law only when it exceeds three months and there is no evidence to explain the delay. (See *Benjamin v. Dalmo Mfg. Co.* (1948) 31 Cal.2d 523, 532; see also *Stafford v. Mach* (1998) 64 Cal.App.4th 1174, 1184 [stating that the "three-month unofficial 'standard' " established in *Benjamin* "remains true today"].) By any reckoning, given this precedent, Minick met the standard of acting "within a reasonable time."

Finally, as to the issue of prejudice, the City claims Minick, having seen how the court analyzed its summary judgment motion, in effect obtained an advisory opinion on the hazardous condition issue under Government Code section 835, giving him an unfair tactical advantage in further litigation with the City on that issue. We have no doubt the grant of relief here improved Minick's position in his effort to defeat the City's motion, but that kind of "prejudice" is inherent in any grant of section 473 relief. Coming at the prejudice issue from another angle, the City argues it is bound to incur unfair financial burden due to the need to re-litigate issues presented in its summary judgment motion. On this point, the City once again puts greater stock in the finality of an interim order than is warranted. Trial courts always have discretion to revisit interim orders in service

20

of the paramount goal of fair and accurate decisionmaking.  (See, e.g., *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1107–1109 [after denial of summary judgment motion and filing of second summary judgment motion on the same grounds a year later, trial court may may reconsider its original denial sua sponte in the absence of new facts or law]; *In re Marriage of Barthold* (2008) 158 Cal.App.4th. 1301.)  The City may well have incurred some additional cost as a result of the court's decision to revisit its initial summary judgment decision by granting section 473 relief, but that was unavoidable. Where the statute by its terms applies, and a court grants discretionary relief reopening summary judgment proceedings, some replowing of ground will always be necessary. The alternative the City suggests, in any event, would give it undeserved windfall protection from exposure to Minick's claim.

### III.   DISPOSITION

The trial court's order of August 7, 2014 granting Minick relief under section 473, subdivision (b), from the grant of summary judgment against him is affirmed.

 

 

_____
Streeter, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.

A143187/*Minick v. City of Petaluma*

<u>Minick v. City of Petaluma (A143187)</u>


Trial Court:    Sonoma County Superior Court

Trial Judge:    Hon. Gary Nadler

Counsel:

Meyers, Nave, Riback, Silver & Wilson, Kevin E. Gilbert and Kevin P. McLaughlin for Defendant and Appellant.

The Dolan Law Firm, Christopher B. Dolan; Dwyer + Kim and  John P. Dwyer for Plaintiff and Respondent.